**In the Matter of Harvey L. HALL, Debtor.**

**No. 03–54624 RFH.**

United States Bankruptcy Court, M.D. Georgia, Macon Division.

Sept. 24, 2009.

Harvey L. Hall, pro se.

Thomas C. James, III, Walter E. Jones, Macon, GA, for Movant.

Ward Stone, Jr., Austin E. Carter, Macon, GA, for Respondent.

## MEMORANDUM OPINION

ROBERT F. HERSHNER, JR.,
Bankruptcy Judge.

Scott T. McArdle, Movant, filed with the Court on October 10, 2008, a Potential Administrative Fee Claimant Scott T. McArdle's Motion To Stay Case Closing And Distributions To Creditors Pending Determination Of Claim. Movant filed an amendment to his motion on October 27, 2008. Movant filed on November 25, 2008, a Potential Administrative Fee Claimant Scott T. McArdle's Motion To Disgorge All Attorneys Fees, Costs, And Expenses Paid To Attorney James E. Carter. James E. Carter, Respondent, filed a response on January 20, 2009. Movant's motions came on for a hearing on January 21, 2009. The Court, having considered the motions, the response, the evidence presented, and the arguments of counsel, now publishes this memorandum opinion.

Harvey L. Hall, Debtor,[1] is the Chapter 7 debtor in this bankruptcy case. Justin Hall was the Debtor's son. In December 2002 Justin Hall underwent bariatric surgery in the Coliseum Hospital in Macon, Georgia. Shortly after the surgery, Justin Hall died. Debtor is the heir to and the administrator of his son's estate.

Movant is an attorney licensed to practice law in Alabama and Mississippi. Movant resides in Montgomery, Alabama. Personal injury claims make up about 85% of Movant's practice. Debtor was referred to Movant by a mutual friend. After talking with Debtor and after obtaining information concerning the death of Debtor's son, Movant agreed to represent Debtor in pursuing medical malpractice claims. Movant testified that he did a "thorough work-up" and a pre-analysis of Debtor's claims.[2] Movant and Debtor signed a contingent fee agreement dated January 8, 2003. Movant was to receive 45%, plus expenses, of any recovery. Debtor resided in and signed the agreement in Georgia. Movant signed the agreement in Alabama. Movant does not keep time records in contingent fee cases.

The alleged medical malpractice occurred in Georgia. Movant is not licensed to practice law in Georgia. Movant was working on an unrelated personal injury case (the "*Reed v. Ford Motor Company* case")[3] with Respondent, who resides in and is licensed to practice law in Georgia. Respondent was lead counsel and Movant was co-counsel in the *Reed* case. During a meeting in the *Reed* case, Movant talked with Respondent about Debtor's claims. Movant gave Respondent a package of information.[4] Respondent agreed to represent Debtor. Respondent and Debtor signed a contingent fee agreement. Respondent was to receive 45%, plus expenses, of any recovery. Respondent signed the agreement on January 20, 2003. Debtor signed the agreement on January 22, 2003.

Debtor understood he had two attorneys, Movant and Respondent, and the combined amount of their contingent fees would be 45% of any recovery.[5] Debtor understood that Respondent was his "primary lawyer."[6]

In April 2003 Respondent and Movant agreed to share any recovery on Debtor's

---

1. Harvey L. Hall is also known as Bo Hall.

2. Transcript of Hearing ("Tr.") pp. 27–28; 66–67.

3. Reed is sometimes spelled Reid.

4. Tr. pp. 69–70; 92.

5. Tr. pp. 73–74.

6. Tr. pp. 72–73.

claims on a 60%–40% basis.[7] This was the same fee sharing agreement Respondent and Movant had in the *Reed* case. Although Debtor was not immediately aware of the fee sharing agreement, he testified that he had no objection to the agreement.[8] Movant testified his 40% share of the contingent fee was not a "referral fee" and he expected to be actively involved in pursing Debtor's claims. Movant testified he and Respondent had a "lot of discussions" concerning the selection of medical experts. Respondent wanted to have the experts "in line" before the malpractice actions were filed.[9]

On September 5, 2003, Respondent, on behalf of Debtor, filed two medical malpractice actions in the State Court of Bibb County, Georgia. The Coliseum Hospital was the defendant in one action. Justin Hall's doctor was the defendant in the other action. Movant was not listed as co-counsel in the malpractice actions.[10]

Movant testified that, after the malpractice actions were filed, he served Debtor diligently, he communicated with Debtor on a regular basis, he spent countless hours explaining the law to Debtor, and he explained the reasons Respondent may not be returning Debtor's telephone calls.[11]

On October 6, 2003, Debtor filed in this Court a petition under Chapter 7 of the Bankruptcy Code. Debtor was represented by Charles E. Gay who is a local bankrupt-cy attorney.[12] Debtor did not consult with Movant or Respondent before he filed for bankruptcy relief.[13] Debtor listed his malpractice actions in Schedule B (personal property) and in Schedule C (property claimed as exempt). In Schedule I (current income of debtor) Debtor listed Respondent as his attorney in the malpractice actions. Movant was not listed in Debtor's bankruptcy schedules or statement of financial affairs. J. Coleman Tidwell (hereafter "Trustee") was appointed to be the Chapter 7 trustee of Debtor's estate. Debtor told Trustee about his malpractice actions at the "meeting of creditors." [14] Debtor testified that Trustee did not ask for the name of his attorney or the court where the malpractice actions were pending.[15]

Debtor did not list his contingent fee agreements with Movant and Respondent as executory contracts in Schedule G of his bankruptcy petition. Trustee did not seek approval from the Court to accept or reject the agreements as executory contracts.[16]

Some six or seven months later, Debtor told Respondent that he had filed for bankruptcy relief. Neither Debtor or Respondent told Movant about the bankruptcy case. Debtor testified that he was "ashamed of it." Movant testified that he did not know about Debtor's bankruptcy

---

7. Although Respondent and Movant did not sign a written fee sharing agreement, there is no dispute that they agreed to share any recovery.

8. Tr. p. 73.

9. Tr. p. 30.

10. The Court reaches this conclusion by noting that in May 2007 Movant sought to be admitted *pro hac vice* in the malpractice actions.

11. Tr. pp. 61–62.

12. Mr. Gay was not present at the hearing on Movant's motions.

13. Tr. p. 78.

14. 11 U.S.C.A. § 341(a) (West 2004).

15. Tr. pp. 80–81.

16. 11 U.S.C.A. § 365(a), (d)(1) (West 2004 & Supp.2009).

until May or July 2007.[17]

The Court entered an order on January 30, 2004, granting Debtor a discharge under Chapter 7 of the Bankruptcy Code.

Trustee, as the representative of the bankruptcy estate, succeeded to Debtor's interest in the malpractice actions. Trustee asked Respondent to represent him in prosecuting the malpractice actions. On March 19, 2004, Trustee filed an application to employ Respondent pursuant to 11 U.S.C. § 327(e) for the specified purpose of prosecuting the malpractice actions. Respondent agreed to represent Trustee on a contingent fee basis of 45% plus expenses. The Court entered an order on March 26, 2004, approving Respondent's employment. Respondent understood that he represented Trustee on behalf of the bankruptcy estate. Respondent understood that he no longer had a contractual obligation to split any contingent fees with Movant. Respondent testified that Movant wasn't doing anything in the malpractice actions.[18] Respondent understood that Debtor told Movant that Respondent was representing Trustee in the malpractice actions.[19] Movant testified that he did not know until May or July 2007 that Respondent had been appointed to represent Trustee.

During the next four years, Respondent prosecuted the malpractice actions on behalf of Trustee. Respondent did not tell Debtor that he no longer represented Debtor in the malpractice actions.

Debtor continued to contact Movant and Respondent to inquire about the malpractice actions. The parties hotly dispute whether Debtor had difficulty contacting Respondent. Debtor testified that he had difficulty contacting Respondent. Debtor understood that Respondent was his "primary lawyer." Respondent testified that he returned Debtor's telephone calls but Debtor's telephone would sometimes be disconnected. Movant served as an "intermediary" between Debtor and Respondent. Movant testified that he communicated with Debtor on a regular basis and that he received hundreds of telephone calls from Debtor. On a number of occasions Movant contacted Respondent to inquire about the malpractice actions. Movant then relayed the information to Debtor. Debtor testified that Respondent would "jump on me for calling Mr. Ardle [Movant]." Debtor testified that Respondent told him not to call Movant anymore.[20] Debtor, however, continued to call Movant.

When asked what contributions Movant made to the prosecution of the malpractice actions, Respondent testified "Other than calling and saying Bo [Debtor] was calling upset or other than sending me an occasional letter, he [Movant] did absolutely nothing."[21] Respondent testified "As near as I could see, he [Movant] was holding Mr. Hall's [Debtor's] hand from time to time, but that was it."[22]

Respondent was lead counsel and Movant was co-counsel in the *Reed v. Ford Motor Company* case. Respondent was terminated by his clients in the *Reed* case and a new lead counsel was employed. The termination occurred after Respondent had filed Debtor's malpractice actions in state court[23] and after Respondent had

17. Tr. p. 31; 42; 57–58.
18. Tr. p. 96.
19. Tr. p. 99.
20. Tr. pp. 77–78.
21. Tr. p. 92.
22. Tr. p. 95.
23. Tr. p. 92.

been employed to represent Trustee in the malpractice actions.[24] When the *Reed* case settled, Movant received a fee [25] and Respondent received reimbursement of some of his expenses.[26]

Respondent testified "The *Reed* case left my office and as far as I was concerned, you know, if Bo [Debtor] wanted to call Mr. McArdle [Movant] and ask him questions, that was one thing, but as far as I was concerned, mine and Scott McArdle's [Movant's] relationship was terminated." [27]

Respondent testified "I considered that I had no further obligation to Scott McArdle [Movant]." [28] Respondent testified "It [his termination in *Reed*] ruined the basis for a 60/40 division with Mr. McArdle [Movant], absolutely.... The basis of any 40/60 [sic] deal was off, yes." [29] Respondent testified that he did not tell Movant that he would not honor their fee sharing agreement.[30]

Respondent testified:

"I don't know what Mr. McArdle [Movant] was doing. I think Mr. McArdle [Movant] was anticipating, perhaps, that he was going to sit there and do nothing and get a 40 percent fee, but that wasn't going to happen.... And the reason I didn't stir up anything, Mr. Hall is on medication. Mr. Hall has memory problems. Mr. Hall has emotional problems and I wasn't about to stir a pot that was going to sidetrack this case." Tr. p. 98.

Movant sent Respondent a letter dated May 24, 2007, stating he and Debtor were disturbed about the lack of progress in the malpractice actions. Movant proposed that Respondent either have Movant admitted *pro hoc vice* in the malpractice actions or that Respondent immediately withdraw from his representation of Debtor so substitute counsel could be employed. Movant testified that Respondent agreed to have him admitted *pro hoc vice.*[31]

Movant sent Respondent a letter dated July 19, 2007, stating he had not received the documents to be admitted *pro hoc vice.* Movant stated that unless he received the documents by August 1, 2007, he would presume that Respondent no longer desired to be Debtor's counsel. Movant testified that Respondent did not respond to his letter.[32]

Movant testified he first learned that Debtor had filed for bankruptcy relief "around the time of my letters" to Respondent. Movant called Respondent and stated he expected that Debtor would look to him for advice as to whether the malpractice actions should be settled or should go to trial.[33] Movant testified that he told Respondent:

"I don't see how I'm going to be able to advise him [Debtor] and, therefore, if I was to continue to remain in the dark." And Mr. Carter [Respondent], at that point, expressed to me that, "Well, it really doesn't matter what you or Bo [Debtor] say, because the bankruptcy trustee is in charge," at which point I expressed surprise. I asked him [Respondent] whether he had applied to

24. Tr. p. 102.

25. Tr. pp. 54–55.

26. Tr. pp. 55; 91.

27. Tr. p. 92–93.

28. Tr. p. 100.

29. Tr. p. 101.

30. Tr. p. 102.

31. Tr. pp. 40–41; 59.

32. Tr. p. 41.

33. Tr. p. 31.

have us hired and he said, "Yeah, we've done that. We've taken care of that, but it really doesn't matter. The bankruptcy trustee's going to say what happens." Tr. p. 32.

Movant testified "I asked him [Respondent] specifically whether he had taken the steps necessary to employ us and he [Respondent] said, 'Absolutely, we wouldn't have the case if we didn't.' " [34]

On November 1, 2007, Trustee filed with the Court an application to employ Ed S. Sell, III and his law firm to assist Trustee in resolving the malpractice actions. The Court entered an order on November 2, 2007, approving the employment.

The malpractice action against the Coliseum Hospital was submitted to mediation in May 2008.[35] Debtor, Trustee, Respondent, and Ed S. Sell, III were present at the mediation.[36] Debtor thought he was being represented by Respondent.[37] Trustee and the Coliseum Hospital reached a confidential settlement. On May 28, 2008, the Court ordered all documents pertaining to the terms and conditions of the settlement to be placed under seal. On June 8, 2008, the Court entered an order approving the settlement. The settlement was sufficient to pay in full all unsecured claims that were filed, administrative claims, Respondent's contingent fee, and to return a surplus of $394,618.99 to Debtor.[38] Trustee told Debtor that he would receive his share of the settlement funds in 30 to 90 days. Trustee paid Respondent his contingent fee of $340,000 and expenses of $35,000.[39]

On October 3, 2008, Debtor called Movant and said "I'm just calling to see where my money is." [40] Debtor told Movant the malpractice case had settled in May 2008. Movant testified he was surprised because he was not aware of the mediation or the settlement. Movant sent Respondent a letter dated October 3, 2008, via facsimile and mail, asking what was going on.

Respondent sent Movant a handwritten letter dated October 3, 2008, stating the malpractice action against the Coliseum Hospital had settled for a confidential amount and the bankruptcy trustee (Trustee) was the client. Respondent stated Debtor was awaiting approval of the closing of the bankruptcy estate (before receiving his share of the settlement funds). Respondent stated that if Movant wanted to take over the malpractice action against Justin Hall's doctor, Movant should pay Respondent for his expenses and then Movant "can have it all."

Respondent sent Movant a letter dated October 6, 2008, that stated the settlement (with the Coliseum Hospital) was under a "strict confidentiality agreement." Respondent stated the bankruptcy estate's assets included the malpractice actions and Trustee had hired Respondent to prosecute the actions. Respondent stated the bankruptcy court had approved the settlement (between Trustee and the Coliseum Hospital). Respondent stated his fee ($340,000) had been paid after being approved by the bankruptcy court. Respondent stated "Scott [Movant], I just don't see how I can proceed to represent Mr.

---

34. Tr. pp. 42–43.

35. The malpractice action against Justin Hall's doctor is still pending in state court.

36. Tr. pp. 76; 94.

37. Tr. pp. 76–77.

38. Docket No. 52. This document is part of the record that is open to the public.

39. Docket Nos. 41, 52. These documents are part of the record that is open to the public.

40. Tr. pp. 41–42; 84.

Hall [Debtor] any further and for this reason, I intend to withdraw.... I will cooperate with the attorney whom Mr. Hall [Debtor] obtains to go forward with this case, but Mr. Hall's [Debtor's] conduct last week requires me to withdraw as his counsel." [41]

Movant called Trustee on October 6, 2008. Movant told Trustee that he had been working in the malpractice actions. Movant testified that Trustee "didn't know me" and offered no assistance. Movant does not have a signed agreement to represent Trustee in the malpractice actions. [42]

Movant sent a letter dated October 6, 2008, to the Clerk of this Court. Movant alleged that Respondent had breached their attorney fee agreement and asked that Debtor's bankruptcy case be held open to allow Movant to "make an appropriate filing." Movant retained local counsel who filed the motions presently before the Court.

Debtor testified that Respondent never told him that Respondent was representing Trustee rather than Debtor in the malpractice actions. [43]

### Conclusions of Law

Movant filed a motion on October 10, 2008, which he amended on October 27, 2008, asking the Court to stay the closing of Debtor's case to allow him an opportunity to assert a claim. Movant's claim is now before the Court. The Court is persuaded that Movant has received the relief requested and that the motion filed on October 10, 2008, and the amended motion filed on October 27, 2008, are moot.

Movant filed on November 25, 2008, his Potential Administrative Fee Claimant Scott T. McArdle's Motion to Disgorge All Attorneys Fees, Costs, And Expenses Paid To Attorney James E. Carter. Movant contends Respondent violated Bankruptcy Rules 2014(a) and 2016(a) by failing to disclose his connection with a creditor (Movant) and his fee sharing agreement with Movant. Movant contends Respondent should disgorge all compensation ($340,000) and expenses ($35,000) that the Court awarded. Movant asks the Court to unseal Respondent's application for compensation so Movant can confirm his suspicion that Respondent violated certain provisions of the Bankruptcy Code and Rules.

Movant contends he rendered legal services in the malpractice action against the Coliseum Hospital. Movant contends he is entitled to 40% of the compensation the Court awarded to Respondent. Movant contends that Respondent should disgorge his compensation of $340,000. Movant seeks to be compensated from the disgorged funds. Movant does not seek any compensation from the funds that have been paid to Debtor, Trustee, or creditors. [44] In his post-hearing brief, Movant asks that he be appointed *nunc pro tunc* as special counsel in the malpractice action.

Respondent denies he violated the Bankruptcy Code or Rules. Respondent contends Movant does not have standing to bring his motion to disgorge because he is not a creditor of Debtor's estate. Respondent contends his fee sharing agreement with Movant was terminated and that he has no obligation to share fees with Movant. Respondent asks the Court to deny any relief to Movant.

---

**41.** The record shows that Respondent has not withdrawn as attorney for either Debtor or Trustee.

**42.** Tr. pp. 64–65; 68.

**43.** Tr. pp. 74–75.

**44.** Movant's post-hearing brief p. 15 (Feb. 10, 2009), Docket No. 70; Tr. p. 13.

When Debtor filed for bankruptcy relief, an estate was created which included all legal or equitable interests of Debtor in property as of the commencement of the case. 11 U.S.C.A. § 541(a) (West 2004). Debtor's malpractice actions against the Coliseum Hospital and his son's doctor became property of the estate. Trustee succeeded to Debtor's interest. Trustee did not pursue the malpractice actions as the agent of Debtor, rather Trustee pursued the actions as Debtor's successor in interest. Only Trustee, not Debtor, had the power to settle the malpractice action against the Coliseum Hospital. *In re Williams,* 197 B.R. 398, 402 (Bankr.M.D.Ga.1996) (Hershner, C.J.)

### Movant's Standing

Respondent contends that Movant does not have standing to bring his motion to disgorge. In *E.F. Hutton & Co. v. Hadley,*[45] the Eleventh Circuit Court of Appeals held that the bankruptcy trustee did not have standing to bring certain actions. The Eleventh Circuit held that a standing issue is resolved without considering the likelihood of success on the merits. 901 F.2d at 983. The Eleventh Circuit stated:

> In order to analyze standing, the Supreme Court has formulated a two-component framework, consisting of "irreducible" constitutional requirements and prudential considerations. Satisfaction of the constitutional requisites for standing necessitates the demonstration of three factors. First, the party asserting standing must have suffered actual injury or show the imminence of such injury. Abstract harm is insufficient; the litigant must establish "actual or threatened injury." Second, the injury must be fairly traceable to the alleged unlawful conduct. Third, a demonstration must be made that the requested relief likely will redress the injury. When standing has been contested, it is the burden of the party claiming standing, "to plead and prove injury in fact, causation, and redressability."

> After satisfying these constitutional requirements, a party claiming standing also must demonstrate that prudential considerations do not restrain the trial court from hearing the case. The Court recognizes three considerations which discourage judicial action despite a party's satisfaction of the constitutional prerequisites for standing: (1) assertion of a third party's rights, (2) allegation of a generalized grievance rather than an injury particular to the litigant, and (3) assertion of an injury outside the zone of interests of the statute or constitutional provision. The party alleging standing must surmount all of these prudential concerns.

901 F.2d at 984–85.

In *PHP Liquidating, LLC v. Robbins,*[46] the district court stated:

> Whether an action accrues to a creditor individually, such that a creditor has standing, or generally, such that a trustee has standing, requires the court to look "to the injury for which relief is sought and consider whether it is peculiar and personal to the [creditor] or general and common to the ... creditors." "A cause of action is 'personal' if the claimant [or creditor] himself is harmed and no other claimant or creditor has an interest in the cause." A cause of action is general if the injury is common to all creditors.

291 B.R. at 610.

Movant contends that he is a prepetition creditor of the bankruptcy estate under

---

**45.** 901 F.2d 979 (11th Cir.1990).

**46.** 291 B.R. 603 (D.Del.2003) aff'd. 128 Fed. Appx. 839 (3rd Cir.2005).

Georgia's attorney lien statute. O.C.G.A. § 15–19–14 (2008). Movant contends that he is a postpetition administrative expense claimant because he rendered legal services that benefitted the bankruptcy estate. Movant contends Respondent should disgorge his compensation because he violated the Bankruptcy Rules. Movant seeks to be compensated from the disgorged funds.

■ A standing issue is resolved without considering the likelihood of success on the merits. Movant contends he suffered actual injury because he has not been compensated for his legal services. If Movant prevails, he may be entitled to compensation which would benefit Movant personally. Movant has a financial stake in the outcome of this litigation. Movant contends that Respondent falsely represented that both of them had been employed by Trustee to prosecute the malpractice actions. Movant contends he should be compensated from funds that the Court awarded to Respondent. The Court is persuaded that Movant has standing to pursue his claim for compensation.

***Trustee's Rejection of the Contingent Fee Agreements***

■ "[A]n attorney's contingent fee contract is [an] executory [contract] if further legal services must be performed by the attorney before the matter may be brought to a conclusion." *Tonry v. Hebert, (In re Tonry),* 724 F.2d 467, 468 (5th Cir.1984).

■ Debtor entered into contingent fee agreements with Movant and Respondent. The contingency was a recovery in the malpractice actions. The contingency

did not occur before Debtor filed for bankruptcy relief. Trustee did not seek approval from the Court to accept or reject the contingent fee agreements. The agreements are deemed rejected. 11 U.S.C.A. § 365(a), (d)(1)(West 2004 & Supp.2009) (in a Chapter 7 case executory contracts are deemed rejected after 60 days if trustee does not assume or reject). The rejection constitutes a breach of the agreements immediately before the date of the bankruptcy filing. § 365(g)(1). The rejection gives rise to a claim for damages which is treated as a prepetition claim. § 502(g)(1). State law determines the amount of the damages. *Medical Malpractice Insurance Assoc. v. Hirsch, (In re Lavigne),* 114 F.3d 379, 387 (2nd Cir.1997).

■ Rejection does not terminate, cancel, or rescind an executory contract. Rejection frees the bankruptcy estate from the obligation to perform but it has absolutely no effect upon the contract's continued existence. *Thompkins v. Lil' Joe Records, Inc.,* 476 F.3d 1294, 1306 (11th Cir.) cert. denied 552 U.S. 1022, 128 S.Ct. 613, 169 L.Ed.2d 393 (2007); *3 Collier on Bankruptcy* ¶ 365.09[3] (15th ed. rev.2009). Rejection, however, may excuse or release the non-breaching party from any further performance obligation. 476 F.3d at 1308.

***Movant's Prepetition Claim***

■ The deemed rejection of the contingent fee agreement between Movant and Debtor gives rise to a prepetition claim for damages as determined by state law. Movant contends that he is a prepetition creditor under Georgia's attorney lien statute.[47] Georgia law provides for a statutory attorney's lien in actions[48] for the

---

47. The Court questions but need not decide whether the attorney lien statute applies to Movant, an out of state attorney who was not admitted *pro hac vice. See Martin & Martin v. Jones,* 541 So.2d 1 (Ala.1989).

48. The action at issue is Debtor's malpractice action against the Coliseum Hospital.

recovery of money. O.C.G.A. § 15–19–14(b)(2008). The lien arises when the action is filed. *Howe & Assoc., P.C. v. Daniels,* 280 Ga. 803, 631 S.E.2d 356, 357 (2006).

It is clear that there had been no recovery in the malpractice actions when Movant's contingent fee agreement was deemed rejected. Movant is not entitled to a fee under the contingent fee agreement. Rather Movant's attorney fee, if any, is under the equitable remedy of *quantum meruit. Ellerin & Assoc. v. Brawley,* 263 Ga.App. 860, 589 S.E.2d 626 (2003).

■■■■ An attorney who is discharged is not entitled to collect a contingent fee if the discharge occurs before the contingency specified in the fee agreement.[49] Absent express provisions addressing fees in the event of discharge, the attorney is limited to the equitable remedy of *quantum meruit* under which the attorney can recover the reasonable value of services rendered. The discharged attorney can pursue a *quantum meruit* claim against his former client or against his former co-counsel who continued to represent the client until the conclusion of the case. *Kirschner & Venker, P.C. v. Taylor & Martino, P.C.,* 277 Ga.App. 512, 627 S.E.2d 112 (2006).

■■■■ Under *quantum meruit,* attorney fees are valued in light of the amount of work done and by the results obtained. The court must determine whether the client received any benefit from the services and the value of the services rendered. Value is determined in terms of value to the client. *Lewis v. Smith,* 274 Ga.App. 528, 618 S.E.2d 32, 35–36 (2005)

cert. denied; *Ellerin & Assoc. v. Brawley,* 589 S.E.2d at 629.

■■■■ A *quantum meruit* claim requires proof as to the reasonable value of the attorney's services. *Sosebee v. McCrimmon,* 228 Ga.App. 705, 492 S.E.2d 584, 587 (1997); See *William H. Stoll, LLC v. Scarber,* 287 Ga.App. 672, 652 S.E.2d 834, 836 (2007).

■■■■ The deemed rejection of the contingent fee agreement between Movant and Debtor gives rise to a *quantum meruit* claim for the value of Movant's prepetition services.[50] Proof of value is required. The Court, from the evidence presented, is unable to determine the value, if any, of Movant's services. Movant did not keep time records. Movant has not suggested a reasonable hourly rate or a reasonable value of his services. Movant has not provided any means for the Court to determine the reasonable value of his services. The Court must have some proof as to value. The Court is unable to award any attorney fees for Movant's prepetition services.

### Movant's Post–Petition Administrative Expense Claim

■■■■ The Court approved Respondent's employment as attorney for Trustee in prosecuting the malpractice action against the Coliseum Hospital. The Court awarded compensation of $340,000 for services Respondent rendered to Trustee. Movant contends that he is entitled to 40% of that compensation pursuant to the fee sharing agreement between Movant and Respondent. Movant asks the Court to approve his employment *nunc pro tunc* in the malpractice action. *In Miller Buckfire & Co.,*

---

**49.** The contingency in the fee agreement, recovery on the malpractice action, did not occur before Debtor filed for bankruptcy relief.

**50.** Movant's contingent fee agreement does not have a provision addressing fees in the event of discharge.

*LLC v. Citation Corp., (In re Citation Corp.),*[51] the Eleventh Circuit stated:

> Sections 328 and 330 provide two separate mechanisms for the estate to employ a professional.
>
> Section 328 allows the trustee, with the bankruptcy court's approval, to employ a professional under § 327 "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a fixed percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a). Even if the trustee and the bankruptcy court pre-approve a professional's compensation pursuant to § 328, the bankruptcy court "may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." *Id.*
>
> Absent pre-approval under § 328, the bankruptcy court awards a professional "reasonable compensation for actual, necessary services rendered" by the professional based on "the nature, the extent, and the value of such services," and considering the time spent on such services, and the cost of comparable services. 11 U.S.C. § 330(a).

493 F.3d at 1318–19.

The Court, from the evidence presented, is unable to find that Movant's services benefitted Trustee or the bankruptcy estate. Movant, on a number of postpetition occasions, contacted Respondent to inquire about the status of the malpractice cases. Movant then relayed the information to Debtor. In the Court's view, Movant was inquiring as to what Respondent was doing to prosecute the malpractice cases. Although Movant's inquiries may have been comforting to Debtor, Movant has not demonstrated how his services benefitted Trustee or the bankruptcy estate. Movant did not conduct or participate in any post-petition discovery. Movant did not file any pleadings or motions in the malpractice action against the Coliseum Hospital. Movant's services did not represent any significant part of the effort required to prosecute the malpractice action.[52]

The Court is not persuaded that Movant is entitled to an award of compensation under either 11 U.S.C.A. § 328(a) or § 330(a). The Court therefore need not address Movant's request to be appointed *nunc pro tunc.*

### Movant's Claim For Breach of Contract

Movant contends Respondent breached their prepetition fee agreement to share any recovery on the malpractice actions on a 60%–40% basis. Respondent contends the fee sharing agreement was terminated because the subject of the agreement, the contingent fee agreements that Respondent and Movant entered into with Debtor, are deemed rejected under § 365(d)(1). Respondent also contends the fee sharing agreement is unenforceable under Rule 1.5(e) of the Georgia Rules of Professional Conduct.

In the Court's view, the breach of contract dispute between Movant and Respondent does not impact Debtor's bankruptcy estate. Movant seeks 40% of the funds that the Court awarded Respondent. If Movant is successful, he can collect his compensation from Respondent. Movant does not seek any compensation from the funds that have been paid to Debtor, Trustee, or creditors. Movant has not shown that the outcome of the contract dispute

---

**51.** 493 F.3d 1313 (11th Cir.2007).

**52.** See *In re Foster,* 247 B.R. 731 (Bankr. S.D.Ohio 2000).

impacts the rights, liabilities, or handling and administration of the bankruptcy estate. The dispute is a disagreement between former co-counsel. The dispute involves state contract law, state bar rules, and the attorney-client relationship. The Court is persuaded the contract dispute is a matter between Movant and Respondent that should be resolved in state court.

### Disgorgement of Compensation

 Movant contends that Respondent violated Bankruptcy Rules 2014(a) and 2016(a) by failing to disclose his connection with a creditor (Movant) and his fee sharing agreement with Movant. Movant contends that Respondent should disgorge all compensation ($340,000) that the Court awarded. Neither Trustee nor Debtor have moved the Court to require Respondent to disgorge his compensation.

Trustee's application for approval to employ Respondent stated that it was "for a specified purpose pursuant to 11 U.S.C. [§ ] 327(e), to act on behalf of the Trustee in pursuing a wrongful death of a child claim."

Section 327(e) of the Bankruptcy Code provides:

§ 327. **Employment of professional persons**

. . .

(e) The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C.A. § 327(e) (West 2004).

Bankruptcy Rule 2014(a) provides that an application for employment shall be accompanied by a verified statement setting forth the attorney's connections with certain entities. Bankruptcy Rule 2014(a) provides in part:

**Rule 2014. Employment of Professional Persons**

**(a) Application for an order of employment**

. . .

The application [for employment] shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr.P.2014(a).

Respondent executed an "Affidavit of Proposed Attorney" dated March 15, 2004, stating in part that he had no connection with the entities named in Bankruptcy Rule 2014(a), except that he had represented Debtor in a wrongful death claim prior to the bankruptcy filing.

After an attorney has rendered services, the attorney may apply for compensation. The attorney is required to file an application which discloses whether he or she has an agreement or understanding to share compensation with any other entity. Bankruptcy Rule 2016(a) provides in part:

**Rule 2016. Compensation for Services Rendered and Reimbursement of Expenses**

**(a) Application for compensation or reimbursement**

An entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts

requested. An application for compensation shall include a statement as to ... whether an agreement or understanding exists between the applicant and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with the case, and the particulars of any sharing of compensation or agreement or understanding therefor, except that details of any agreement by the application for the sharing of compensation as a member or regular associate of a firm of lawyers or accountants shall not be required.

Fed. R. Bankr.P.2016(a)

 An attorney has an affirmative duty to disclose fully and completely any fee agreements and payments. Disgorgement of fees may be proper even though the failure to disclose resulted from negligence or inadvertence. *Henderson v. Kisseberth, (In re Kisseberth)*, 273 F.3d 714, 720–21 (6th Cir.2001). *See Mapother & Mapother, P.S.C. v. Cooper, (In re Downs)*, 103 F.3d 472, 479 (6th Cir.1996).

The Court is persuaded that Movant's motion to disgorge is a fee sharing dispute between Movant and Respondent. All of Debtor's unsecured creditors that filed claims have been paid in full. Neither Debtor nor Trustee have moved the Court to require Respondent to disgorge his compensation. No one, including Movant, contends that the amount of the settlement with the Coliseum Hospital was less than reasonable. The Court has determined that Movant is not entitled to any prepetition or postpetition compensation from the bankruptcy estate.

Respondent testified that his relationship with Movant terminated and that he had no further obligation to Movant when Respondent was terminated as lead counsel in the *Reed* case. Respondent understood that his relationship with Movant had ended. The Court is not persuaded that Movant violated the disclosure requirements of Bankruptcy Rules 2014(a) and 2016(a).

The Court is persuaded that the dispute between Movant and Respondent should be resolved in state court. The Court is also persuaded that Movant's request to unseal Respondent's application for compensation should be denied.

An order in accordance with this memorandum opinion will be entered this date.